809 So.2d 360 (2001)
STATE of Louisiana
v.
Daniel FELDER.
No. 2000 KA 2887.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
*364 Scott M. Perrilloux, District Attorney, Amite by Zata W. Ard, Assistant District Attorney, Counsel for Appellee State of Louisiana.
Frederick Kroenke, Baton Rouge, Counsel for Defendant/Appellant Daniel Felder.
Before: FITZSIMMONS, WEIMER, and DOWNING, JJ.
WEIMER, J.
Daniel Felder was indicted by a grand jury for the second degree murder of Earl Robinson in violation of LSA-R.S. 14:30.1.[1] He pled not guilty. After a jury trial, the defendant was found guilty as charged. The defendant filed a motion in arrest of judgment, a motion for new trial, and a motion for post-verdict judgment of acquittal, all of which were denied by the trial court. The trial court subsequently sentenced defendant to life in prison at hard labor without benefit of parole, probation, or suspension or sentence.
By virtue of this appeal, defendant raises four assignments of error.

FACTS
On February 20, 1999, Earl Robinson arrived at the Dagg Reed apartment complex in Hammond, Louisiana. According to testimony by Mary Lee Moore, Robinson was picking her up so they could go to Angola State Prison to visit Moore's fiancé and Robinson's friend, Carl Watson. Carl Watson was in prison for the second degree *365 murder of Ivory Quillen. Ivory Quillen, Jessie Quillen, and the defendant, Daniel Felder were all brothers.
Witness Lashelle Newsom testified that she saw Earl Robinson arrive at the apartments and exit his car. She then saw him having a conversation with Jessie Quillen. The discourse between Jessie Quillen and Robinson led Newsom to say to another observer, Daisy Moore, that "somebody [was] fixing to get killed here." Newsom then saw the defendant, who was off to the side holding a gun, begin to shoot Robinson. According to Newsom's testimony, Robinson fell to the ground after being shot several times. The defendant then "got over him" and started shooting down at him. Newsom specifically testified she did not see anything in Robinson's hands during his conversation with Quillen, did not see him holding anything resembling a weapon, did not see him make any aggressive moves towards the defendant or Quillen, and did not see him make a movement as if he were reaching for a gun. Afterwards, Newsom remained near Robinson until the police arrived. She did not observe a weapon lying on the ground near him, nor did she see anyone go up to him to retrieve anything from his body.
Daisy Moore also witnessed the shooting. She testified she saw the victim and Jessie Quillen talking outside the apartment building. She went inside the building to get her children because she "heard it was going to be some shooting." When she came back out, she saw the defendant standing off to the side with a weapon. He shot Robinson several times. Moore testified she did not see Robinson make any aggressive movements towards Jessie Quillen or the defendant, and she did not see him holding anything in his hands. Finally, Moore added that after the shooting, she did not see anyone retrieve anything from Robinson's body. The defendant and Jessie Quillen are Lashelle Newsom's cousins and Daisy Moore's nephews.
Jessie Quillen also testified for the State, stating that Robinson had asked him if he was Ivory Quillen's little brother. Quillen added he believed Robinson had been involved in the murder of his brother, Ivory. Quillen testified that during his conversation with Robinson, he did not feel threatened, nor did he see Robinson pull a weapon or anything that looked like a weapon out of his pocket. At some point, Quillen noticed the defendant had arrived and saw him shoot Robinson several times. According to Quillen, after Robinson fell to the ground, the defendant walked over to him, straddled him, and shot him some more. Quillen said that he and his brother, the defendant, then fled the scene.
Officer Tim Penton, Jr. testified he was the first patrol officer on the scene, that a large crowd of people was around the body of the victim, that no individual in the crowd was closer than 8 feet to the body, and that he did not see a weapon on the body of the victim or on the ground by the victim. Sergeant Tommy Corkern testified he found 6 shell casings on the ground at the scene of the murder, but did not find any weapon at the scene.
Dr. James Traylor performed the autopsy on Robinson. He testified the victim was shot 8 times, with three wounds to the left lung, any one of which would have been fatal. He retrieved 3 jacketed projectiles from the victim's body which Sergeant Corkern identified as being .380 caliber bullets. Lieutenant Paul Wade Miller testified .380 caliber bullets can be used in a 9 mm. gun.
Jessie Quillen and the defendant turned themselves in to police the day after the shooting. In a statement to police, the defendant admitted shooting Robinson with a 9 mm. gun, but said he only did so *366 because he saw Robinson's hand come out of his pocket holding something black. At trial, the defendant additionally explained that although Robinson never even looked at him or acknowledged his presence, he shot him because he became afraid for his life and that of his brother's when he saw Robinson make a movement to withdraw his hands from his pockets. Although the defendant admitted Robinson "probably" could have been going for something else, and although the defendant testified he did not actually see Robinson remove anything from his pockets, the defendant claimed he believed the victim was "going for a weapon," so he shot him.

ANALYSIS

I. Character Evidence of the Victim
In his first assignment of error, the defendant asserts the trial court erred in refusing to allow the defendant to introduce to the jury evidence of the victim's dangerous reputation. The defendant's case rested primarily on his assertion that he shot Robinson in self-defense. Defendant alleged Robinson's reputation as a dangerous character who had a propensity to pull a gun on people led him to fear for his life and the life of his brother such that he had to shoot Robinson before Robinson had time to pull a gun out of his pocket. Finding no evidence of an "overt act" as required under LSA-C.E. art. 404, the trial court refused to allow the defendant to introduce evidence of the victim's dangerous character.
The defendant argues that under the jurisprudence, victim character evidence is admissible if there is "appreciable evidence" of an overt act by the victim in the record. Defendant further asserts this standard can be met solely by defendant's testimony, even where it conflicts with the testimony of others. Defendant claims his testimony regarding his belief the victim was about to pull a gun constituted appreciable evidence of an overt act by the victim justifying the introduction of victim character evidence.
Article 404 of the Louisiana Code of Evidence provides for the admissibility of character evidence. It states, in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
. . . .
(2) Character of victim. (a) ... evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused ... provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible....
B. Other crimes, wrongs, or acts.
. . . .
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible .... [Emphasis added.]
Evidence of the dangerous character of the victim is admissible only if the accused first produces evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against the accused of such character that it would have created, in the mind of a reasonable person, a belief he *367 was in immediate danger of losing his life or suffering great bodily harm. State v. Miles, 98-2396, p. 7 (La.App. 1 Cir. 6/25/99), 739 So.2d 901, 906, writ denied, 1999-2249 (La.1/28/00), 753 So.2d 231; State v. Brooks, 98-1151, p. 10 (La.App. 1 Cir. 4/15/99), 734 So.2d 1232, 1237, writ denied, 99-1462 (La.11/12/99), 749 So.2d 651; State v. Ducre, 596 So.2d 1372, 1378-79 (La.App. 1 Cir.), writ denied, 600 So.2d 637 (La.1992).[2]
To meet the "overt act" requirement of Article 404, this court has held the defendant must introduce "appreciable evidence" in the record relevantly tending to establish the overt act. Miles, 98-2396 at 7, 739 So.2d at 906; Brooks, 98-1151 at 10, 734 So.2d at 1237. Once the defense has introduced such appreciable evidence, the trial court cannot exercise its discretion to infringe on the fact-determining function of the jury by disbelieving this defense testimony and denying the accused a defense permitted him by law. Miles, 98-2396 at 7-8, 739 So.2d at 906. A trial judge's determination the defendant has not laid a sufficient evidentiary foundation upon which to introduce testimony concerning the victim's dangerous character will not be disturbed absent a finding of clear error. State v. Jackson, 419 So.2d 425, 427 (La.1981).
We find the trial court did not err in deciding to exclude evidence related to the victim's character because of the absence of "appreciable evidence" of an overt act by the victim. Comparing the facts of this case to those cases in which appellate courts have found the trial court usurped the jury's fact-finding function by improperly disregarding or disbelieving defense testimony, we find the level of "appreciable" evidence present in those cases to be greater than the mere self-serving testimony of the defendant that is present herein. For example, in Brooks, 98-1151 at 10-12, 734 So.2d at 1238, the trial court concluded there was no appreciable evidence of an overt act when it apparently chose to disregard, in favor of prosecution witness testimony, the testimony of the defendant and another eyewitness that a group of men, including the victim, menacingly followed them through a parking lot after a heated argument. This court held the trial court had improperly weighed the inconsistent testimony of the witnesses rather than allowing the jury to decide the weight to be accorded to the evidence. As such, given the testimony of the defendant and the eyewitness, there was "appreciable evidence" of an overt act justifying the admission of victim character evidence. Similarly, in Jackson, 419 So.2d at 426-27, the supreme court held that in light of the defendant's and another eyewitness' testimony regarding the victim's aggressive acts toward the defendant, the trial court had erred in precluding the admission of victim character evidence on the basis there was no appreciable evidence of an *368 overt act by the victim. Finally, in State v. Lee, 331 So.2d 455 (La.1975), the defendant, as well as two other defense witnesses, testified the defendant only shot the victim after he swung at and cut the defendant with a knife. The supreme court held this constituted appreciable evidence of an overt act by the victim, despite the fact the witnesses' testimony was contradicted by prosecution witnesses.
At trial herein, the State introduced the defendant's statement, given to police the day after the murder. In that statement, the defendant said he shot the victim when he saw him pull something black out of his pocket during an argument with the defendant's brother. The defense introduced the statement of Jessie Quillen, also taken the day after the murder. In that statement, Quillen told police he saw the defendant shoot the victim after the victim pulled a pistol out of his pocket. At trial, Quillen testified he did not tell the truth in his police statement when he mentioned the victim had pulled out a gun. Rather, Quillen testified he and the victim were not arguing, and the victim never threatened him in any way, nor did he pull a weapon prior to being shot by the defendant. Eyewitnesses Lashelle Newsom and Daisy Moore both testified they saw the victim and Jessie Quillin having a conversation during which the victim made no aggressive or threatening movements nor did he pull a weapon of any sort. Several law enforcement officers testified they did not find a weapon on the person of the victim or in the vicinity of where he was shot.
Most significant to this issue, however, is the defendant's own testimony at trial. The defendant admitted he did not see the victim pull anything out of his pocket, be it a weapon or any item that looked like a weapon. He stated the victim never looked at him or even acknowledged he was aware the defendant was present. The defendant merely saw the victim and his brother arguing, saw the victim make a movement while his hands were in his pockets, and shot the victim because he did not want to give him an "opportunity" to pull a weapon on him or his brother.
Unlike the defendants in Brooks, Jackson, and Lee, the defendant herein can only point to excerpts from his own testimony as evidence the victim made a movement with his hand which the defendant believed indicated the victim was about to pull a gun.[3] No eyewitness corroborates this testimony, as all other witnesses testified the victim made no threatening gestures to the defendant or his brother. The self-serving, uncorroborated, and contradicted testimony of the defendant does not constitute appreciable evidence tending to establish an overt act on the part of the victim. See Miles, 98-2396 at 8, 739 So.2d at 906-907; State v. Schexnayder, 97-0729, pp. 9-10 (La.App. 1 Cir. 4/8/98), 708 So.2d 851, 855, writ denied, 98-1665 (La.10/30/98), 723 So.2d 978; State v. Demery, 28,396, pp. 5-6 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, 521-522, writ denied, 96-2346 (La.2/7/97), 688 So.2d 497.
Moreover, even assuming there was some other evidence apart from defendant's testimony that the victim did start to remove his hands from his pockets sufficient to rise to the level necessary to constitute "appreciable evidence," we do not find this evidence tends to prove, in any way, the commission of a hostile demonstration or overt act on the part of the victim that would lead a reasonable person *369 to believe he was in immediate danger of losing his life or suffering great bodily harm. See State v. Jones, 451 So.2d 1181, 1185 (La.App. 1 Cir.1984) (Victim's act of "going in his pocket" for what defendant believed to be a knife during an argument with defendant was insufficient appreciable evidence of an overt act that would lead reasonable person to fear for his life.); Schexnayder, 97-0729 at 9, 708 So.2d at 855 (Victim's actions of moving towards defendant while cursing and reaching in his pocket did not constitute requisite overt act.); Ducre, 596 So.2d at 1379 (Even assuming the victim had a gun in his back pocket, there was no overt or hostile act by the victim when he approached the defendant during an argument and made certain hand gestures).
In the present case, the defendant admitted at trial the victim did not even look at him or acknowledge his presence in any way. Instead, he shot the victim repeatedly before he was even able to ascertain what the victim had in his hand, if anything. As noted by the defendant himself, "[the victim] probably just was going for something else." Clearly, a reasonable person would not have felt, under these circumstances, as if he was in immediate danger of losing his life or of suffering great bodily harm.
In sum, the defendant's self-serving, uncorroborated, and contradicted testimony that the victim made a sudden movement to withdraw his hands from his pockets during an alleged argument with the defendant's brother failed to constitute appreciable evidence of an overt act or hostile demonstration by the victim that would have created, in the mind of a reasonable person, a belief he was in imminent danger of losing his life or suffering great bodily harm. Accordingly, the trial court's decision to exclude evidence of the victim's dangerous character was not clearly erroneous. This assignment of error is without merit.

II. Excessive Sentence
In his second assignment of error, the defendant asserts the trial court's sentence of life in prison at hard labor constitutes an unconstitutionally excessive sentence. A thorough review of the record indicates the defendant's attorney below did not make a written or oral motion to reconsider sentence. Under LSA-C.Cr.P. arts. 881.1(D) and 881.2(A)(1), the failure to make or file a motion to reconsider sentence shall preclude the defendant from raising an objection to the sentence on appeal, including a claim of excessiveness. Accordingly, the defendant is procedurally barred from having the instant assignment of error reviewed. State v. Duncan, 94-1563 (La.App. 1 Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc per curiam).

III. Ineffective Assistance of Counsel
In his third assignment of error, defendant contends his trial counsel's failure to file a motion for reconsideration of sentence constituted ineffective assistance of counsel resulting in his serving a constitutionally excessive life sentence. A claim of ineffective assistance of counsel is ordinarily raised in an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted. However, where evidence of the alleged error is contained in the record, and the issue is raised by assignment of error on appeal, we may address the issue in the interest of judicial economy. State v. Seiss, 428 So.2d 444, 448-49 (La.1983); State v. Tolliver, 464 So.2d 1088, 1090 (La. App. 1 Cir.1985). Accordingly, we will address defendant's claim of ineffective assistance of counsel.
Whether or not defendant's counsel's assistance was so defective as to *370 require reversal of his sentence is subject to a two-part test established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. Applying this test to the issue at hand, it is clear a failure to file a motion to reconsider sentence in itself does not constitute ineffective assistance of counsel. However, if the defendant can show a reasonable probability that, but for counsel's error, his sentence would have been different, a basis for an ineffective assistance claim may be found. State v. Pendelton, 96-367, p. 30 (La.App. 5 Cir. 5/28/97), 696 So.2d 144, 159, writ denied, 97-1714 (La.12/19/97), 706 So.2d 450. Thus, the defendant must show that but for his counsel's failure to file a motion to reconsider sentence, the sentence would have been changed, either in the district court or on appeal.
Article I, Section 20 of the Louisiana Constitution of 1974 prohibits the imposition of excessive punishment. Although a sentence may fall within statutory limits, it may nevertheless violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. State v. Reed, 409 So.2d 266, 267 (La.1982). A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La.1982). See also State v. Savario, 97-2614, p. 8 (La.App. 1 Cir. 11/6/98), 721 So.2d 1084, 1089, writ denied, 98-3032 (La.4/1/99), 741 So.2d 1280; and State v. Fairley, 97-1026, p. 6 (La.App. 1 Cir. 4/8/98), 711 So.2d 349, 352-53.
Under LSA-R.S. 14:30.1(B), a person convicted of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Courts are charged with applying a statutorily mandated punishment unless it is unconstitutional. State v. Dorthey, 623 So.2d 1276, 1278 (La.1993). Indeed, it is incumbent on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional by "clearly and convincingly" showing that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
State v. Henderson, 99-1945, p. 19 (La. App. 1 Cir. 6/23/00), 762 So.2d 747, 760 (quoting State v. Johnson, 97-1906, p. 8 (La.3/4/98), 709 So.2d 672, 676), (quoting State v. Young, 94-1636, pp. 5-6 (La.App. 4 Cir 10/26/95), 663 So.2d 525, 531, (Plotkin, J., concurring.), writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223.)
In the instant case, the defendant makes no attempt whatsoever to rebut the presumption the mandatory life sentence for a second degree murder conviction is constitutional. Indeed, the defendant does not give a single reason why the sentence is excessive as to him in particular. After a long exposition on the case law applicable *371 to the issue of excessive sentence, the defendant simply complains the trial court sentenced him without enunciating any of the factors provided in the sentencing guidelines found in LSA-C.Cr.P. art. 894.1. During sentencing, the trial court simply stated that the defendant had been found guilty of second degree murder, that the mandatory sentence was life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, and that it had no discretion to sentence the defendant otherwise.
The Code of Criminal Procedure sets forth, in Article 894.1, items which must be considered by the trial court before imposing sentence. Generally, the trial court need not recite the entire checklist of factors, but the record must reflect that it adequately considered the guidelines. State v. Shipp, 98-2670, p. 6 (La.App. 1 Cir. 9/24/99), 754 So.2d 1068, 1072. The factors guiding the decision of the trial court are necessary for an appellate court to adequately review a sentence for excessiveness and, therefore, should be in the record. Otherwise, a sentence may appear to be arbitrary or excessive and not individualized to the particular defendant. State v. Shipp, 98-2670 at 6, 754 So.2d at 1072. The failure to articulate reasons for the sentence as set forth in Article 894.1 when imposing a mandatory life sentence is not an error; however, articulating reasons or factors would be an exercise in futility since the court has no discretion. State v. Jones, 31-613, p. 28 (La.App. 2 Cir. 4/1/99), 733 So.2d 127, 146, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434; State v. Williams, 445 So.2d 1264, 1269 (La.App. 3 Cir.), writ denied, 449 So.2d 1346 (La.1984).
In any case, we find in the record a more than adequate basis to justify the trial court's refusal to deviate from the legislative mandate. Showing deliberate intent and malice, the defendant shot the victim, who was unaware of the defendant's presence, several times until he fell to the ground. Then, according to more than one witness, the defendant proceeded to stand over, or straddle, the victim and shoot several more bullets into his body. The defendant, whose trial testimony gives the reader the impression he feels no remorse for this crime, sought to justify his actions by saying he was compelled to shoot the victim even before he was sure the victim had a weapon just in case the victim was pulling a gun. Given the callous disregard for life shown by this defendant, it is not surprising that the trial court felt no reason to deviate from the mandatory sentence of life imprisonment. Furthermore, as stated earlier, the defendant does not give any reason why the circumstances of his case are so exceptional as to justify his receipt of a sentence specifically tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. See Henderson, 99-1945 at 20, 762 So.2d at 761. As such, we conclude the defendant did not receive ineffective assistance of counsel when his trial counsel failed to file a motion to reconsider sentence because the defendant has not shown that his sentence was excessive and would have been changed, either in the district court or on appeal, had such a motion been filed.

IV. 24-Hour Delay
With his final assignment of error, the defendant asserts the trial court violated LSA-C.Cr.P. art. 873 when it failed to wait twenty-four hours between the denial of defendant's post-trial motions and the imposition of sentence. He argues this lack of a delay deprived him of the opportunity to gather and present evidence which would have mitigated his sentence.
*372 Article 873 of the Louisiana Code of Criminal Procedure provides that "[i]f a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." The record reveals the motion for new trial and the motion in arrest of judgment were denied at a hearing on September 27, 2000. The trial court then asked the defense attorney if he was aware of any applicable delays which would prevent sentencing. Upon receiving a negative answer and an indication the defendant had no other motions to file, the trial court proceeded to sentence the defendant.
Defendant implicitly waived the twenty-four hour waiting period required by LSA-C.Cr.P. art. 873 by failing to enter a contemporaneous objection when the trial court indicated it would sentence the defendant without delay and by indicating a readiness for sentencing. See State v. Hilton, 99-1239, p. 17 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, 1038, writ denied, XXXX-XXXX (La.3/9/01), 768 So.2d 113; State v. Roberts, 98-1706, pp. 11-12 (La.App. 1 Cir. 5/14/99), 739 So.2d 821, 829; State v. Lindsey, 583 So.2d 1200, 1206 (La.App. 1 Cir.1991), writ denied, 590 So.2d 588 (La. 1992). Additionally, we can find no prejudice resulting from the court's failure to delay sentencing. In the instant case, the trial court lacked sentencing discretion given the mandatory sentence applicable to second degree murder. A person convicted of second degree murder "shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." LSA-R.S. 14:30.1(B). The defendant received this sentence. Delay or no delay, the sentence the judge was required to impose would have been the same. Accordingly, even assuming the defendant had not implicitly waived the delay, any error in the trial court's failure to observe the twenty-four hour delay is harmless beyond a reasonable doubt and does not require a remand for resentencing. State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Bilbo, 97-2189, p. 13 (La.App. 1 Cir. 9/25/98), 719 So.2d 1134, 1141, writ denied, 98-2722 (La.2/5/99), 737 So.2d 747.

PATENT ERROR
As pointed out correctly by the defendant, the trial court, at the time of sentencing the defendant for the instant offense, failed to advise him of the time limitation for the filing of post-conviction relief applications as contained in LSA-C.Cr.P. art. 930.8. Article 930.8(C) of the Code of Criminal Procedure provides that, at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for applying for post-conviction relief. A failure to do so on the part of the trial court has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for re-sentencing. The trial court is directed to give the defendant written notice of the prescriptive period for applying for post-conviction relief within ten days of rendition of this opinion and to file written proof in the district court record of the proceedings that the defendant has received the notice. See State v. Johnson, 98-1407, p. 16 (La.App. 1 Cir. 4/1/99), 734 So.2d 800, 809-10, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439; State v. Morgan, 93-2365, p. 5 (La.App. 1 Cir. 12/22/94), 648 So.2d 1063, 1065-66, writ denied, 95-0207 (La.6/2/95), 654 So.2d 1104.

CONCLUSION
The trial court did not err in precluding the introduction of victim character evidence given that the defendant's self-serving, *373 uncorroborated, and contradicted testimony that the victim made a sudden movement to withdraw his hands from his pockets does not constitute appreciable evidence of an overt act or hostile demonstration by the victim that would have created, in the mind of a reasonable person, a belief he was in imminent danger. Defense counsel did not provide ineffective assistance of counsel by failing to file a motion to reconsider sentence. The defendant did not show clearly and convincingly that his circumstances justified a deviation from the mandatory life sentence applicable to second degree murder. As such, his sentence was not excessive and it is not reasonably probable his sentence would have been changed either in the district court or on appeal had a motion to reconsider sentence been filed. Finally, the defendant implicitly waived the twenty-four hour delay period provided by LSA-C.Cr.P. art. 873 when he assented to being sentenced immediately after the denial of his post-trial motions and indicated there was no applicable delay. Even assuming there was no waiver, the defendant, whose sentence was mandated by statute, was not prejudiced by the lack of the twenty-four hour delay.
CONVICTION AND SENTENCE AFFIRMED.
DOWNING, J., concurs without reasons.
FITZSIMMONS, J., concurs, and assigns reasons.
FITZSIMMONS, Judge, concurring, with reasons.
The case law requires "appreciable evidence" of an overt act before character evidence is admissible. State v. Miles, 98-2396, p. 7 (La.App. 1 Cir. 6/25/99), 739 So.2d 901, 906, writ denied, 1999-2249 (La.1/28/00), 753 So.2d 231; see La. C.E. art. 404. "Appreciable evidence" may consist simply of the defendant's testimony. If a plaintiff in a civil action can prove the facts of the case by his or her own testimony, thus constituting proof by a preponderance of the evidence, then the lesser, amorphous standard of "appreciable evidence" of an overt act can be accomplished solely by a defendant's testimony in a criminal case. If the testimony provides a reasonable basis for finding an overt act occurred, and is accepted by the trier of fact, no more is required. For these reasons, I respectfully concur in the result.
NOTES
[1] Jessie Quillen, the defendant's brother, was also originally indicted for second degree murder. However, the indictment was subsequently amended to charge Jessie Quillen with accessory after the fact to murder in violation of LSA-R.S. 14:25. The disposition of that case is not contained in this record.
[2] The reasons for this limitation on admissibility of victim character evidence were aptly stated by our colleagues in the Louisiana Fourth Circuit Court of Appeal:

That the deceased's reputation should in such situations be accepted as affecting the defendant's apprehensions is clear. But the unconditional and indiscriminate admission of such evidence is dangerous. The danger is, not only that the deceased's reputed character, once in evidence, will be appealed to as justifying the deliberate destruction by private hands of a detested malefactor, but also that, though no plausible situation of self-defence [sic] is otherwise evidence, [sic] this evidence will be improperly used to confuse the issue as if there were real doubt about the necessity for defence [sic] and the apprehension of danger.
State v. James, 95-1182, p. 3 (La.App. 4 Cir. 6/5/96), 675 So.2d 1224, 1226, quoting II WIGMORE on Evidence, § 246 at 46-47 (3d ed.1940).
[3] We need not consider Jessie Quillen's statement, made to police, and later retracted at trial, that the victim pulled a gun on the defendant given the fact that the defendant, at trial, admitted this was not true and stated he did not actually see the victim pull any item of any kind out of his pocket.